This is 2011-15-46. Mr. Hill. Thank you, Your Honor. May it please the Court. The District Court erred below by imparting a negative inferential limitation into broader crime language, specifically with respect to the authorized relating terms of the independent claims 1, 4, and 10. The District Court failed in the final portion of the construction with the negative limitation quote, through the user account only by those media players. I'm having a hard time. Maybe I can sort of narrow you in because I'm having a hard time understanding your claim construction point. It seems to me, so tell me if I'm wrong, you're not really quibbling or disagreeing with the claim construction of this provision. You're just saying that even if you construe it as the District Court did, the only portion he erred on was that the claim does not preclude accessing the media assets through unauthorized devices as well. Is that a correct statement of your position? That and the fact that he erred with the mode of access as being exclusively one through the user account and that that should be the prism through which exclusivity of devices should be tested. So in other words, in the iTunes system, you had, with respect to the disproof of infringement, if you will, the test was that an unauthorized desktop computer associated itself with the user's iTunes store account and downloaded the asset. Now, without the affirmative act of authorization, it could not actually use the asset by playing a movie or listening to the song. And it couldn't transfer the asset to another device that could do it until those desktop devices were in fact authorized with the user account. The failing of the District Court's construction is that instead of focusing on authorizing as an event of registration whereby the device is simply specified in the user account and therefore the quality of access in that device is enhanced thereby, the District Court went on to express this language of through the user account only by those media players specified in the user account. That exclusivity of access, access through the user account, and the exclusivity of devices, meaning that there could be no other devices that were capable of accessing media assets through the user account, did not flow naturally either from a person of ordinary skills understanding of the term authorized as it appears in the independent claims or from a review of the specification and the prosecution of a series of problems. For example, if we look at Claim 4, which the District Court found so influential in ultimately adopting this construction, the Court focused on the system language of the preamble as if that somehow breathed life into this claim. But in actuality, the elements of the system claim included a server application that had the capability of recognizing whether or not two or more devices were specified in that user's account. And then when it came to the mode of access, the separate element of an application residing on the media player itself enabling access was what was specified by the claim. The District Court looked at a claim that separated a server application's authorizing from the application software on the device itself accessing and decided that access through the user account, i.e. on the server side, was somehow an exclusive criteria for testing the authority of the device itself to access the media asset. There was no support in the District Court's opinion that cites to a person of ordinary skill in the art how a person of ordinary skill in the art would naturally understand the word authorize as it appears in these claims. But is your dispute with the fact that it applied, in essence, the word only? In other words, it didn't let you do other things as well that weren't covered by this? That is, in fact, a major criticism. Let me just simplify this down to, you have a step in a claim and it says doing X, Y, and Z. And the District Court construes it to say, you've got to do only X, Y, and Z. And then you come in and you say, no, the infringer does D. And that's also covered under X, Y, that ought to be covered by the claim. Is that this case where you're sounding in with that? That isn't. That isn't, in fact, this case. So what basis do you have for covering D in that example then? If you agree that hypothetical is analogous to this case, the reason someone might say that you're limited to X, Y, and Z and not to D is because you didn't claim D. Why is that wrong? I know I'm simplifying this, but I'm having a hard time understanding your argument. I understand what you're trying to say. The reason why that's wrong at point blank is that the claims recite comprising in the preamble. And this court has said, for example, in the Gillette case, where you have 30 references to a three-blade razor, but the claim limitation said comprising, then recited three blades. Well, that's an interesting point. And it's not limited to the four. I appreciate that. But it doesn't seem to me – first glance, before reading the briefs, I thought that was your argument. But it doesn't seem to me that the argument you made in your briefs really hung its hat on the term comprising. You argue a lot about the word plurality. You argue a lot about negative limitations. But is that your argument, then, that when you have the word comprising, that means that the district court cannot constrain itself to what's actually claimed, the limitation itself, and that it can be other things? Is that your position? With respect to the bedrock principle of the claim language itself, yes. Because it's not – all of these points, they work together, Your Honor. The emphasis on comprising, the emphasis on plurality, and the emphasis of any word negating an open-ended construction that would naturally follow therefrom. So the absence of words like only or exclusively should be taken into consideration, as should an open-ended term like plurality preceding the word operative, as should the use of the phrase comprising in a preamble. All of it lines up, to borrow from Phillips, to point to the construction that most naturally aligns itself with the claim. What about the prosecution history and the discussion of the Milstead reference? Yes, Your Honor. Well, in Milstead, in the case of Milstead, of course, you have a discussion about how Milstead works. And a patent owner has to have the ability to explain to the examiner of the prior art without the discussion of how the prior art works necessitating a disclaimer. That was exactly what was presented to this court in the microchemical case where there was a discussion about the prior art rooster machine. But it didn't – but merely because of the aspects of the prior art were disclosed, that didn't necessitate a disclaimer. In this case, there was a discussion about how in Milstead, all of the devices in the universe of applicable devices that could conceivably access a particular piece of content that was originally purchased at the electronic storefront, you would never find within that universe of devices a subset of devices that drew their access to the asset by virtue of the fact that they were associated with a user account. And five times in differentiating Milstead, in a four-page reference, five times the inventor said Milstead doesn't teach a user account, therefore Milstead cannot teach time access to the inclusion of a device with a user account. To put it into the terms of the accused system and how it operates, it's undisputed that in iTunes, multiple devices are authorized with millions of user accounts. And as a result of those authorizations, it is again undisputed that these devices attain a type of access to the asset that they did not have prior to the event of being authorized with the user account. That is what these claims require. These claims are focused on having two or more devices authorized with a user account whereby they get some access that they didn't previously have. The construction of the district court with the inclusion of the negative limitation that it inferred from the prosecution history essentially changes the entire focus of the independent claims. Instead of the inventors attempting to invent the empowerment of devices to access media assets by virtue of their authorization with the account, the focus now is no longer on those devices that are authorized with the user account. Instead, we're focused on Apple's argument about a device that identified itself through the user account but never technically registered with the user account before it purchased and downloaded an asset, notwithstanding the fact that it can actually play the asset until it ultimately authorizes itself with that user account. But isn't the point that under the patented system, the only way to get access to the assets is through an authorized account? Your Honor, looking at column nine, you see the description of the virtual media asset library. This is A125. Starting at line 60 and going through 67, it actually teaches that the devices that are associated with the account are the devices that will have access in the preferred embodiment. And the preferred embodiment lines up with iTunes in that sense because the device that downloads, that is the basis for the district court's imposition of summary judgment, it is associated with the user account. It couldn't get the asset except by going through the iTunes store account. But what it wasn't was it wasn't specified in the user account. And authorization means specification through the active registration. With the court's permission, I'd like to reserve the rest of my time. We will do that. Mr. Hill? Mr. Rookwood? May it please the court. The district court's judgment should be affirmed both because its claim construction was correct and because there is no genuine issue of material fact and Apple is entitled to judgment as a matter of law. Let's go back to the claim construction issue because this court has really focused on that in the first part of this argument. The Apple trial team down below focused on the written description and the prosecution history and the district court ended up focusing on the plain language of the claims. And I think counsel is right to talk about the fact that this case is an example of the Phillips admonition from this court that our task here is to determine based on the claims, the written description and the prosecution history, what those terms would have meant to one of the ordinaries still in the art. So let me start with plain language, which the court, the district court, found so persuasive here. The claims are directed to a method for managing access or to a media asset management system. And every one of those claims requires that there be authorization of devices with the user account or that the devices be authorized with the user account and also then allowing access to the media assets associated with the user account to those authorized devices. But your friend says, at least one of the arguments as I understand it, is that the court didn't limit itself to the language. It inserted the word only in its construction and that at least given the word comprising, that's improper. Well, what the court was trying to do there, and this is explained at appendix page 60 and 61, was it was trying to focus on what part of the system the claims here that we're dealing with were actually addressing. The iTunes system has media assets stored as part of the system, and for example, songs. And a user can go in and log in and buy a song, and a user can then or later decide to download that song to a player device. And a user, as was shown in Dr. Kelly's experiments, can download the song either to an authorized device, and Apple allows you to authorize up to five different devices, or a user could do like Dr. Kelly did, or I could do, I could go down to the public library and I could use a computer at the public library to download the song that I've already purchased. That would be an example of going in on an unauthorized device, completely unknown to the Apple system and to my registration and with my user account. So, the system there that Apple is doing is allowing access both by authorized and unauthorized devices, and that's the part of the system that Judge Bolson was focusing on. What he was saying is, by saying through the user account, is he was simply saying, we're not dealing here with what happens downstream. Once the user obtains the asset, under certain circumstances in the Apple iTunes system, the user can share that asset. And in fact, in the patent, it talks about the user being able to share that asset. And what Judge Bolson was saying is, we're focusing on a different part of the system. And my colleague said that that's where Judge Bolson went off the rails, because he didn't pay attention in Claim 4 to the fact that that last limitation, which was an application residing on at least one of the authorized plurality of media player devices and enabling the at least one authorized media player device to access the asset. So, in other words, he's focusing on the fact that the application there is on the device. But what is meant by that? Let's go to column 9, line 45, where the patentee gave the written description support for that. Column 9, line 45. The client database application allows the media player user to access files stored at the portal in his or her virtual media asset library. So, clearly, what that's disclosing is that the focus is exactly where Judge Bolson placed it in this case. He said, what these claims are dealing with here is the user going to the system and obtaining that initial download. And at page A60 and 61, Judge Bolson explained, that's the aspect of this disclosure that we're dealing with in the claims. We're not concerned for these claims with what happens downstream. So, the judge very carefully did look at the language there. And not only that language, he looked at the authorizing language in the context of this claim, which is a method for managing access. And it only allows access by the authorized devices. And the way that he looked at that, he also looked at the language that where the user comes in and specifies a plurality of devices, and the system is going to allow access by the plurality of devices. And that's why we cited the Cummings case, which, like the Gillette case and like the Trovan case, used an open transition, a comprising transition. But nonetheless, in the Cummings case, the court said, if you take a look at what's going on here, preparing a suspension and then reacting the components, and then later having a step with making a casting of the suspension, it found that that form of description implied a negative limitation. Just like here, authorizing certain devices and allowing access by those devices implies the negative limitation that one is going to exclude the other devices. Otherwise, it would strip the meaning from the word authorizing and wouldn't make this a media asset management system. It would just allow anything else in. Now, sure, it used the comprising open-ended limitation. There could have been additional steps that were added as far as authorizing. There could have been additional structures added as far as authorizing. But that wouldn't change the fundamental nature of the way these claims and this system works that is in dealing with the user. The download, the access, is only by authorized devices. And we know that because if you look at Cummings and Gillette and Trovan, Gillette and Trovan both went to the written description. And if we do that here, we see it's very clear what is meant is that it's limited to authorized devices because the word authorized or unauthorized appears only in three places in the written description. And if we look at those three places, starting with column 10, line 64, it says a user will have access to his or her licensed assets on other infotainment devices that he or she owns or uses provided. Wait, I'm not following you. You're at column 10. Column 10, line 64. A user will have access provided those other client media player devices are registered with the portal as being authorized to use the user's licensed assets. And so there, provided is a very strong word. And then it goes on at column 11, line 60 to 64. A user has previously purchased a physical media asset, so I go out and buy a CD. The system allows for the introduction of that asset ownership into the database of the portal in addition to the normal use of the asset for the media player device. I can play it or I can upload it to the portal. And if I do that, it says an asset stored locally on a media player, on hard drive or other memory media such as CD or DVD, can be identified and uploaded to the portal for use on other authorized media player devices of that user. Those are the only two places that it talks about authorized. So where does it say about unauthorized? Or what does it say about unauthorized? Yes, there we go to column 12, line 54. To protect the usage of a digital media asset and a media player device, the security lockout procedure is provided to lock out unauthorized media player devices. Those are very clear. And the prosecution history is consistent with that. They argue that they distinguish the prior art for very specific reasons. And that argument does not change the fact that they repeatedly asserted that their user account specifies the plurality of devices that may access the assets. And that's entirely consistent with the claims and the written description. And as a result, the district court's claim construction should be affirmed. The district court's grant of summary judgment should also be affirmed. There is no dispute that an iTunes user can log in with a username and password, log into the system, buy some assets or preorder some assets, some songs, and then come back later on that computer terminal down at the local library. That computer terminal is not listed on that table that lists those five, up to five computers as being unauthorized. By the way, I'm being euphemistic. I'm speaking generally because as the court's aware, a lot of this brief was marked confidential. Yeah, I was going to ask you about that because it seems like we have a lot of confidential markings. Correct, we do. I understand the basis for it. Is it still real? I mean, is it you are adhering to the need for the confidentiality? Correct. Apple views this material as very sensitive because it relates to the security of the use of its system. So I'll try to speak about the tables and the third-party servers in general terms, and I can answer any questions by going directly to the record sites. But the district court issued its decision unsealed. And I'll try and maintain that confidentiality here today. But the bottom line was Dr. Kelly's experiment showed that he could log in and he could download music and movie files, he could play the music files, and he could manipulate the DRM-protected movie files all on an unauthorized computer. There's no dispute about that. What they argue, what that media argues, is that's irrelevant because it wasn't through the user account. They would say that in order to go through the user account, it would require traversing the tables or changing the tables or impacting the tables. There's no requirement in either the claims or the specification or Judge Folsom's claim interpretation that that happened. What Judge Folsom was doing through the user account was focusing on that distinction between what a user can access, these assets, these songs from the system, as opposed to what can be done later. In appendix page 60 and 61, he was very clear about that. What may be done with the media assets outside the system is a separate matter, he said. It was enough here that Dr. Kelly could log in using an unauthorized computer and access those assets. The claims require nothing more. Now, that media argues, well, there's a fact dispute over whether downloading is copying through the user account. There's no factual dispute. There's no genuine dispute about how iTunes operates. The actual downloading occurs through third-party servers, but there's no dispute that a user, in order to get that download to happen, has to go and log in to his or her iTunes user account, and there is a URL that's transferred in a transparent way to the user. There's a URL that's transferred, and that download then comes from those servers. But that media says, well, because it's through these third-party servers, that they're not through the user account, but the patent teaches that the assets, the songs, can be downloaded from different locations, Figure 1 and Column 8, Lines 7 through 20. The patent clearly teaches that. And Judge Ebringham pointed out also, well, wait a minute. He said, this is the way that iTunes works. So it's not just for unauthorized copies, but for authorized copies as well. So if we don't have this happening through the user account for unauthorized copies, it doesn't happen through the user account for authorized copies. So either way, there's no infringement. So the bottom line is that there was no error in the course claim construction. There was no genuine issue of material fact. Apple's entitled to judgment as a matter of law. The district court's claim construction should be affirmed. Thank you, Mr. Rookledge. Mr. Hill has a little rebuttal time. Thank you, Your Honor. The point that I would make right before I finish my argument was this. In the specification, it teaches in the same paragraph that Mr. Rookledge referred the court to, column 9 on page 8125. If you continue down with the description of the client database and the virtual media asset library and how it makes assets accessible to media player devices, specifically says, starting at line 60, each account on the portal has one or more media player devices associated with it. Now, Apple's footnote 1 to its brief makes the point that associated with is broader language than authorized with. And that in fact, they point out that after the discussion of Milstead in the prosecution history, even after that point, the claims were amended where associated was removed and a narrower term, authorized, used. But the mechanism that assures access through the virtual media asset library is merely the association between a device and the user account. What Mr. Rookledge told Your Honors in describing how iTunes works in the tests performed by Apple's experts that disproved infringement, every sentence started with, he showed that you could log in to a user account. That was exactly my point, which is that in the downloading experiments that were performed, which showed that an unauthorized device could technically download before authorizing, that device still had to associate itself with the user account in the iTunes store before it could download. So you have in the accused device, association of the desktop computer with the iTunes store. Then it is downloaded. At no point in the preferred embodiment does it ever describe authorization of the device taking place prior to the download. That's not found anywhere in the preferred embodiment. Instead, the next step, if you want to play the asset on the desktop computer, you have to authorize it with the user account. That is entirely consistent with the language that Mr. Rookledge showed the court starting column 10, A125, line 65, and continuing over to column 11-2. So even if we resort to the specification and look at the specific features of the preferred embodiment, claimed or unclaimed, the district court erred in the construction that it gave to the authorizing term because at the end of the day, the claim language refers to authorization and a person of ordinary skill in the art would understand authorization of a device as being an event that changes the status of that device. In the context of this claim, that status change relates to enhancing the accessibility of the device to the media asset and vice versa. The specification is consistent with that because if you look at the language at column 10, line 67, going over to column 11, line 2, authorization is specifically referenced in the context of registering the device, specifying the device in the user account. Authorization is not understood by a person of ordinary skill in the art as connoting or denoting any exclusivity or any exclusive mode of access. Thank you, Mr. Hale. We will take the case under advisement.